105 Cal.Rptr.2d 819 (2001)
88 Cal.App.4th 509
The PEOPLE, Plaintiff and Respondent,
v.
Eugene PROTSMAN, Defendant and Appellant.
No. D034285.
Court of Appeal, Fourth District, Division One.
March 13, 2001.
Review Denied June 13, 2001.[*]
Roberta K. Thyfault, San Diego, under appointment by the Court of Appeal, for Defendant and Appellant.
*820 Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, and Steven T. Oetting, Deputy Attorney General, for Plaintiff and Respondent.
McINTYRE, J.
A jury convicted Eugene Protsman of first degree murder and found the allegations of robbery, special circumstances and use of a deadly weapon were true. He was sentenced to life in prison without the possibility of parole, plus one year for the weapon enhancement. Protsman appeals, contending the trial court committed reversible error in excluding testimony of one of his defense experts regarding the results of a positron emission tomography (PET) scan of his brain. We hold the court properly excluded this evidence under the test articulated in People v. Kelly (1976) 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (Kelly), and accordingly, affirm the judgment.

FACTS
From January to early February 1997, Protsman and his companion, Deyonne (Dee) Sproles, lived with the victim, Elisabeth Smith, in Smith's trailer in a trailer park in El Cajon. Smith was last seen alive at 4:30 p.m. on February 26, 1997, at the trailer park's dumpster. At 6:12 p.m. that day, Yellow Cab driver, Miguel Tellez, was dispatched to pick up a passenger at Smith's trailer. When Tellez arrived, Protsman flagged him down from outside Smith's trailer and asked him to wait. Protsman then went into the trailer and returned with what looked like a box wrapped in plastic. Protsman put the box inside the cab and went back into the trailer. He returned holding a brown leather bag, climbed into the cab and asked to be taken to the El Cajon trolley station. Protsman was calm and did not do anything unusual during the trip. He also did not appear to be under the influence of any drug.
Early the next evening, Smith was discovered dead in her trailer. She had been beaten to death with a hammerreceiving at least ten blows to the head and three to the chest that fractured her skull in several places and broke three ribs. Smith had no defensive injuries, and no methamphetamine or other illegal drugs or alcohol were in her system at the time of her death.
When the police arrived at the crime scene, they noted a number of inconsistencies. First, with the exception of some blood on the couch cushion where Smith's head lay and a spot of blood on the wall near the ceiling, there was no noticeable blood anywhere in the trailer. Given the nature of Smith's injuries, there should have been a lot more blood around Smith's body and blood splattered over a wide area. In addition, nicotine stains covered nearly every surface in the trailerexcept the wall behind the couch, which appeared to have been wiped down with furniture polish. A large wound on Smith's chest was hidden by a blanket. Her television was turned on and a coffee cup rested on the arm of the sofa, so that she looked to be lying on the couch watching television. The police believed the crime scene had been cleaned and staged, so they searched the trailer park dumpster. There, they found a garbage bag that contained a hammer; a pair of latex gloves; an empty purse; a receipt in the name of Larry SprolesProtsman's alias; several notes written to Smith signed "Larry and Dee"; a piece of paper with the name "Betsy Smith" written four times (Protsman referred to Smith as "Betsy"); and one of Smith's checksthe check was wadded up in a ball and someone had signed Smith's name on it, but had spelled "Elisabeth" with a "z."
On February 28, 1997, at Protsman's request, Dee pawned Smith's stereo, a "boom box" and a gold ring. Several days later, Protsman and Dee went to Julian to pick up some mail. One of the pieces of mail contained a check from Smith and a *821 letter purportedly written by her stating she was paying them the money she owed.
Protsman was arrested on March 15, 1997. He was admonished of and waived his rights under Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and agreed to be interviewed by police detectives. For most of the interview, Protsman denied any knowledge of the murder. He maintained he last saw Smith on February 22 or 23, 1997. Later, he admitted being in her home the day she was killed, but denied killing her. Eventually, Protsman blurted out: "It was the shit ... we were doing that day." He said he remembered showing up at Smith's trailer with some heroin and methamphetamine. Smith then smoked some marijuana laced with the methamphetamine and Protsman "shot" the speed, but could not remember "doing" the heroin. They also ingested a variety of narcotics. Protsman told police he recalled Smith running around the trailer naked and that they had mutual oral sex. Smith also kept asking him to give her an overdose of drugs. According to Protsman, he and Smith were sitting on the couch talking about dying, and he was "smoking dope," and the next thing he knew, "[i]t was over." Protsman claimed he looked around and Smith was dead and everything had been cleaned up. He said he could not remember what he used to kill her. Protsman denied taking Smith's stereo or her money.
In a second interview a few days later, Protsman admitted that before leaving Smith's trailer, he traced her signature onto one of her checks, He also acknowledged that in the period after he killed Smith and before his arrest, he used her calling card to make 20 to 30 phone calls. Protsman claimed he had not taken anything from Smith's trailer except for some groceries he had purchased, but then admitted that he took Smith's stereo and pawned it.
A handwriting expert who reviewed two samples of Protsman's handwriting testified it was probable that Protsman had written the letter purportedly from Smith stating she was paying Protsman and Dee the money she owed and had written out two of Smith's checks. The expert testified that Protsman attempted to disguise his handwriting in each of his exemplars.

Defense
Protsman's mother, Vivian Protsman, testified that he fell out of his bunk bed when he was eight-years old and sustained a head injury. When she found him, blood was coming from his nose and ears, and as a result of his injury, Protsman became deaf in one ear. She also noticed that his attention span became "real short" after the fall. Vivian testified that Protsman sustained a second head injury in a car accident when he was 23-years old.
Several medical experts also testified for the defense. Dr. James Grisolia, a neurologist, conducted a neurological examination of Protsman and concluded he had significant brain damage to his frontal and temporal lobes, which can cause impairment in the ability to control one's impulses. As a result of this brain damage, Protsman could also suffer from blackouts, and this possibility could increase with alcohol and drug use. Dr. Meredith Friedman, a forensic psychologist, saw Protsman on five occasions and administered a battery of neuropsychological tests to him. Dr. Friedman determined Protsman was impaired in the frontal, temporal, and parietal areas of the brain, which would have adverse effects on his judgment and emotional stability. This impairment, coupled with methamphetamine use, could also cause blackouts. Finally, Dr. Clark Smith, a psychiatrist and specialist in addiction psychiatry, testified that persons under the influence of methamphetamine may experience a drug induced psychosis which causes loss of contact with reality. In addition, alterations in memory or level of mental function caused by methamphetamine would be worse in a person with a preexisting head injury. Dr. Smith noted *822 Protsman had been treated for a drug induced psychosis on March 2,1997.

Proffered PET Scan Evidence
The defense also proffered the testimony of Dr. Joseph Wu, the Clinical Director at the University of California, Irvine Brain Imaging Center and a specialist in the field of PET scan imaging, regarding a PET scan he conducted of Protsman's brain. Protsman's written offer of proof stated specifically: "The testimony offered is a positron emission topography (PET) scan administered to the defendant." (A PET scan provides images of metabolic activity in the brain.) The trial court held a hearing regarding the admissibility of this evidence. There, Dr. Wu testified regarding his techniques in administering PET scans and analyzing PET scan images. He then exhibited several vivid images produced by Protsman's PET scan and testified these images indicated Protsman suffered from a decrease in frontal lobe activity and that the pattern of the images was consistent with traumatic brain injury. Dr. Wu maintained the Society of Nuclear Medicine published an article in 1996 which indicated that PET scans were clinically useful in diagnosing moderate to severe head trauma.
The People moved to exclude Dr. Wu's testimony under Kelly, because the use of PET scans to diagnose or evaluate head trauma was not accepted in the neurology and brain imaging field. In support, the People offered articles from medical journals indicating PET imaging was accepted as a clinical tool for diagnosing and evaluating brain tumors, and brain diseases such as seizure disorder, dementia and Alzheimer's, but was not generally accepted or approved for diagnosing or evaluating head trauma or predicting behavior patterns. The People also submitted an article indicating metabolic activity in the frontal lobe as detected in a PET scan decreases with age.
Dr. Alan Waxman, Director of Nuclear Medicine and Cochairman of Imaging at Cedar Sinai Hospital in Los Angeles testified in rebuttal to Dr. Wu's testimony. Dr. Waxman consulted with five other leaders in the field of PET scan imaging, and testified the three accepted uses of PET scans were in cases of stroke, Alzheimer's and epilepsy, and that the use of PET scan imaging for diagnosing or evaluating head trauma was investigational only and had not been validated by the neurology and brain imaging community. Dr. Waxman served on the committee that published the article Dr. Wu referred to in testifying that PET scans are accepted for detecting moderate to severe head trauma. Dr. Waxman testified that the reference in this article regarding head trauma pertained to the limited use of PET scans by Dr. Abass Alavi in evaluating brain trauma in patients who had been recently injured (within 48 hours) and were in the intensive care unit. Dr. Waxman confirmed that he and Dr. Alavi, along with the other experts in the field, had not accepted the use of PET scans for detecting or evaluating brain traumas at a time remote from the injury. Indeed, when Dr. Waxman consulted with Dr. Alavi about the Protsman case, Dr. Alavi confirmed that Dr. Wu's use of PET scan imaging to purportedly diagnose head trauma in people who were walking and functioning was not acceptable. Dr. Waxman had been referred patients for diagnosis of head trauma using PET scan imaging. In these cases, he always informed the referring physician that there would be some difficulty in interpreting the results for purposes of detecting head trauma and that PET scans were not sanctioned by the Society for Nuclear Medicine or the American Academy of Neurology for diagnosing head trauma. Dr. Waxman also testified that over time, individuals will have decreased frontal lobe activity, and that having reviewed Dr. Wu's PET scan of Protsman's brain, he concluded it was normalhe did not see "one single abnormality."
The court excluded Dr. Wu's testimony, concluding that under the Kelly test, use *823 of PET scan imaging to diagnose damage to the frontal lobe caused by a prior head trauma was speculative and not generally accepted by the relevant scientific community. Protsman's attorney then argued Dr. Wu should be allowed to testify that Protsman's PET scan was abnormal in general, but the court held that under the circumstances, such evidence would also be unreliable and speculative as Dr. Wu had specifically testified that Protsman's PET scan was abnormal in that it revealed a pattern consistent with traumatic brain injury.

DISCUSSION

THE TRIAL COURT PROPERLY EXCLUDED DR. WU'S TESTIMONY REGARDING PROTSMAN'S PET SCAN BECAUSE THIS EVIDENCE DID NOT QUALIFY FOR ADMISSION UNDER THE KELLY TEST
Where expert testimony is based on the application of a new scientific technique, its proponent must demonstrate that the method employed is reliablethat is, the particular technique or test must have gained general acceptance in the field to which it belongs. (Kelly, supra, 17 Cal.3d at p. 30, 130 Cal.Rptr. 144, 549 P.2d 1240; see also People v. Leahy (1994) 8 Cal.4th 587, 611-612, 34 Cal.Rptr.2d 663, 882 P.2d 321.) The trial court's ruling on this issue is subject to independent review by the appellate court. (People v. Ashmus (1991) 54 Cal.3d 932, 971, 2 Cal.Rptr.2d 112, 820 P.2d 214.)
Protsman first contends that the general acceptance standard in Kelly does not apply in this case because the proffered testimony of Dr. Wu was a medical opinion based only in part on the PET scan and thus fell "outside the realm of evidence considered a `new scientific technique.' " This contention is belied by the record, particularly Protsman's offer of proof, which expressly states: "The testimony offered is a positron emission topography (PET) scan administered to the defendant. The (PET) scan shows brain atrophy or a lower than normal glucose metabolism." Further, as demonstrated in the evidentiary hearing, the proffered evidence was that of Dr. Wu describing PET scan imaging and his methods pertaining thereto, exhibiting several vivid images from Protsman's PET scan, and opining that the pattern revealed in those images indicated decreased frontal lobe activity consistent with traumatic brain injury. Clearly, the purpose of Dr. Wu's testimony was to put forth evidence of Protsman's PET scan in an attempt to show he had frontal lobe damage caused by a traumatic brain injury. Indeed, Protsman had two other medical experts testifying that in their opinion, Protsman had frontal lobe damage. Accordingly, in order for Dr. Wu's testimony to be admissible, Protsman had to demonstrate that the use of PET scan imaging to diagnose a prior traumatic brain injury was generally accepted in the field of brain imaging and neurology. (People v. Leahy, supra, 8 Cal.4th at pp. 607, 611, 34 Cal.Rptr.2d 663, 882 P.2d 321.) He failed to make this showing.
In order to establish general acceptance of the use of PET scans to diagnose a prior traumatic brain injury, Protsman had to demonstrate substantial agreement and consensus of a cross-section of the relevant scientific community. (People v. Leahy, supra, 8 Cal.4th at pp. 607, 611, 34 Cal.Rptr.2d 663, 882 P.2d 321.) Protsman argues that given Dr. Wu's expertise in the field of PET scan imaging, his testimony was sufficient to make this showing. We disagree. It was not enough to show there were differing views regarding the issue. Protsman had to demonstrate a consensus in the field, which Dr. Wu's testimony did not. Furthermore, our review of the testimony of Drs. Wu and Waxman and the pertinent medical literature, summarized above, reveals that the majority of qualified members in the neurology and brain imaging community do not support the use of PET scans to diagnose prior head trauma and *824 consider the technique generally unreliable for this purpose. Accordingly, we hold the trial court properly excluded Dr. Wu's testimony. (Id. at pp. 611-612, 34 Cal. Rptr.2d 663, 882 P.2d 321.)

DISPOSITION
The judgment is affirmed.
HUFFMAN, Acting P.J., and O'ROURKE, J., concur.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).