Filed 11/9/20  P. v. Smith CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS SMITH,<br><br>        Defendant and Appellant. | B299441<br><br>(Los Angeles County<br>Super. Ct. No. BA468662) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mildred Escobedo, Judge.  Affirmed.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

A jury convicted Carlos Smith of first degree murder and found true the firearm allegations. He was sentenced to 25 years to life for the murder plus a consecutive term of 25 years to life for the firearm enhancement under Penal Code section 12022.53, subdivision (d). We affirm.

Smith contends the trial court erred by not conducting a *Kelly/Frye* hearing on the technique of ballistic comparisons because the relevant scientific community no longer accepts its validity.[1] However, our high court has held that ballistics comparisons are not subject to *Kelly* validation because the technique is not new and jurors can see and evaluate the comparisons for themselves. (*People v. Cowan* (2010) 50 Cal.4th 401, 470; *People v. Venegas* (1998) 18 Cal.4th 47, 81.) Whether that should be revisited in light of some current literature criticizing the validity of the technique, and several federal cases decided under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 (*Daubert*) that have constrained how an expert may testify about such evidence, was not properly raised and the trial court correctly denied it.

We also conclude the trial court did not abuse its discretion in overruling certain evidentiary objections and by refusing to excuse a juror who quietly cried while the jury was shown autopsy photographs. Smith did not object to the fines, fees, and assessments imposed at sentencing and therefore his claim on that ground was forfeited.

---

[1] The two cases are *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013. It is now known as a *Kelly* hearing.

## FACTS

We limit recitation of facts to those relevant to the issues raised on appeal. On May 28, 2018, near 35th and Normandie in Los Angeles, George McClaren was shot once in the back and died at the scene. Found about 90 feet away from the body was an expended .40 caliber shell casing.

A few days later, pursuant to a search warrant, the police found a .40 caliber Glock semiautomatic handgun in a closet in Smith's apartment. The rounds in the magazine were the same brand and caliber as the expended shell casing. Based on ballistics comparisons, a criminalist with the Los Angeles Police Department concluded that the handgun found in Smith's apartment was the handgun that fired the shell casing found at the scene of the killing.

Smith testified in his own defense. He admitted he was there, had a loaded firearm in his hand, and tried to fire it in the direction of where he heard two shots come from. But he was trying to fire at another man who earlier had threatened him with what he thought was a gun. This other man had accused him of stealing a bike and said he would "put a bullet in [his] ass." But Smith said his gun never fired because it jammed.

## DISCUSSION

### I    *People v. Kelly* and Ballistics Comparison Tests

Smith filed an in limine motion to exclude all "firearms comparison evidence." The motion argued the trial court was required to hold a *Kelly/Frye* hearing as to (a) whether firearms comparison tests were generally accepted as reliable within the relevant scientific community, and (b) even if firearms comparison tests had been considered reliable in the past,

whether the relevant scientific community still considered them reliable.  The court denied the motion without an evidentiary hearing.

Ballistics comparison tests, also referred to as firearms comparison tests, are not subject to *Kelly*.  (*People v. Cowan*, *supra*, 50 Cal.4th at p. 470; *People v. Venegas*, *supra*, 18 Cal.4th at p. 81.)  They are not *new* to science and the law; indeed, they have been admitted into evidence in courts in California for years.  Further, they do not invoke the concerns the *Kelly* line of cases is designed to protect the jury against because the results are not, as *Cowan* emphasizes, unduly difficult for jurors to evaluate.  The motion cited *People v. McDonald* (1984) 37 Cal.3d 351, *People v. Bledsoe* (1984) 36 Cal.3d 236, and *Sinaiko v. Superior Court* (2004) 122 Cal.App.4th 1133 (incorrectly cited as *People v. Sinaiko*) for the proposition that ballistics comparison tests are subject to *Kelly*, but none so hold.  None even references those tests.

The motion then argued that current scientific literature had called the reliability of these comparison tests into doubt.  It cited two reports published before *Cowan* came down:  the 2008 report from National Research Council of the National Academies, *Ballistics Imaging*, and the 2009 report from National Research Council of the National Academies, *Strengthening the Forensic Sciences in the United States:  A Path Forward*.  It also cited a later 2016 report from the President's Council of Advisors on Science and Technology, *Report to the*

4

*President, Forensic Science in Criminal Courts:  Ensuring Scientific Validity of Feature-Comparison Methods*.[2]

In a showing of, perhaps, refreshing candor, the trial court admitted it had not read the motion.  Even so, it advised defense counsel that if the validity of ballistics comparison tests "is now called into question, then by all means, let's litigate that.  If you don't have that and are just making an objection in general, I'm gonna deny it and go forward."  In response, defense counsel began discussing the testimony of the criminalist at the preliminary hearing, and "whether or not the people involved in this particular case are adequate under the *Kelly Frye* standard."

Canned motions are a staple of the legal profession.  But when the trial court asks if counsel is prepared to litigate the motion and the response is effectively a "no," then the issue has not been adequately preserved for review.  The burden to show the comparison tests are no longer considered reliable in the relevant scientific community rests on Smith.  The three reports, standing alone, are insufficient to satisfy that burden.  It would need to be demonstrated, for example, that the report authors are part of the *relevant* scientific community, and their opinions would need to be subject to testing within a courtroom

---

[2]    At trial, the criminalist was cross-examined about many of the concerns expressed in these reports, including statistical frequency of similar toolmarks in other Glock 22 firearms and possible interpretation error rates.  She also testified that while a layperson could see the same marks the criminalist can, "a person needs training to understand the significance of the marks seen."  A *Kelly* hearing, had it been requested, perhaps could have further explored whether the toolmarks on the bullet casings were, as *Cowan* suggests, not unduly difficult for the layperson to evaluate.

environment. Even were we willing to wade into the issue with no evidentiary record, which we are not, Smith has not provided any case authority, state or federal, that has held (or that even has suggested) that *Kelly* applies to ballistics comparison testing, or that under that standard such evidence should now be found inadmissible.[3]

The trial court did not abuse its discretion in denying the motion.

II      **Opinion Testimony on Surveillance Video**

The police obtained video surveillance footage from the Circle K across the street and a short distance away from where the shooting occurred. The video showed, among other things, Smith walking towards and away from the Circle K, and walking towards the scene of the crime. It did not show the shooting itself. Smith argues the court improperly allowed two witnesses, his girlfriend Cideli Castro and Detective Everardo Amaral, to testify as to their interpretation as to what was on the video surveillance recordings. He claims it violated Evidence Code section 1523, improperly allowed the officer to offer his opinion as to Smith's guilt, was outside of Amaral's expertise, and abridged his right to a trial by jury. We find the trial court did not abuse

---

[3]      To the extent Smith asks us to apply the standards of *Daubert*, we decline the invitation. The admissibility standards under the state *Kelly* and the federal *Daubert* lines of cases are different. California continues to follow *Kelly*. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831, fn. 7; *People v. Leahy* (1994) 8 Cal.4th 587, 604.)

its discretion and, to the extent there may have been error, it was harmless.[4]

Smith argues his claim is subject to de novo review because the admission of improper expert testimony from Detective Amaral implicated core constitutional rights. This claim of error, however, only involves the application of Evidence Code section 1523 and is subject to the abuse of discretion standard. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) Section 1523 states, with limited exceptions, that oral testimony is inadmissible to prove the contents of a writing. A "writing" for purposes of that section includes video recordings. (Evid. Code, § 250.) Exceptions are limited to lay opinion identification (*People v. Leon* (2015) 61 Cal.4th 569, 601; *People v. Mixon* (1982) 129 Cal.App.3d 118, 128; *People v. Perry* (1976) 60 Cal.App.3d 608, 612–613) and matters sufficiently beyond the experience of jurors that call for expert opinion. (*People v. Sloss* (1973) 34 Cal.App.3d 74, 86–87 [officer properly allowed to testify photograph showed marijuana cigarette. (*Ibid*.)

Smith's claims on appeal are specific.[5] As to his girlfriend, Castro, he argues she was improperly allowed to testify as to her interpretation as to how Smith walked to the Circle K and back,

---

[4]     Smith made a pre-trial motion to exclude much the same evidence. The trial court declined to rule in advance, advising counsel that the objection would need to be raised as evidence was presented. Objections were made sporadically. Although the Attorney General argues the issue was not preserved for review, we disagree.

[5]     Castro and Amaral were asked other questions that implicated Evidence Code section 1523, but those statements are not specifically challenged.

and how he walked towards the scene of the crime. After identifying Smith in the video showing him walking towards the Circle K, she was asked, "Is that how Mr. Smith walks when he's good and he's happy?" She said, "Yes." On his way back from the store, Castro was asked if Smith was "walking differently." She said, "No." Then, in the clip showing Smith walking towards the scene of the crime, she was asked: "Would you agree with me [the prosecution] it was different than the way he was walking when he was going north?" She replied, "He looks the same to me, like—." The prosecution then pushed: "In the clip that we just watched, is that the way Mr. Smith walks when he's a little bit angry?" She said, "Not really." She explained that "[h]e's always walking like that."

It could be argued that the prosecution's questions were a backdoor attempt to have the witness testify as to what the video showed. But we need not address that claim because error, if any, was harmless. The prosecution's argument was that Smith walked "differently" to the scene of the crime. Castro testified Smith always walked that way, and Smith admitted when he testified in his own defense that he was happy walking to the Circle K and angry when he went to the scene of the crime. Moreover, it is highly unlikely given the defense that Smith was intending to shoot someone else and his gun jammed that this testimony influenced the jury's verdict.

As to Detective Amaral, Smith argues the officer was improperly allowed to testify that the video showed there was a large bulge in Smith's pants pocket with a pistol handle showing, that Smith removed the firearm while he was walking, that he removed a cellular telephone from his pocket, that he and Castro interacted, that Castro took something from him, that he put a

hand over the slide and chambered a round, and that the gun did not appear to malfunction. The Attorney General argues this testimony was admissible because it simply helped the jury know where in the video to look for evidence and evaluate what they saw.

This evidence breaks down into two discrete categories. As to the detective's statement it did not appear from the video that the gun malfunctioned when Smith chambered a round, that testimony was admissible as an exception to Evidence Code section 1523. The detective testified as to his knowledge of guns. Whether the video shows the gun malfunctioned is sufficiently beyond the ken of jurors that an expert may testify to that fact. (Evid. Code, § 801, subd. (a).) As to the other testimony, any error was harmless. Smith testified in his own defense. He admitted putting the gun in his waistband, chambering a round, and pulling the trigger. There is no likelihood the introduction of the detective's testimony affirming what Smith expressly admitted had any impact on the verdict.

III    **Refusal to Discharge Juror No. 3 Was Proper**

It was brought to the court's attention by defense counsel that Juror No. 3 had been seen crying during the testimony of the medical examiner, Lawrence Nguyen. Although the trial judge had not observed it, the juror was questioned by the court outside the presence of the other jurors. The court refused to discharge the juror. Smith complains the trial court failed to inquire of the juror thoroughly, interrupted the juror's answers, and failed to question the other jurors to determine if they were affected by the crying juror. We find no abuse of discretion.

Defense counsel advised the court as follows: "One quick, I guess, issue is yesterday during Dr. Nguyen's testimony, I was

advised by my intern, who was here for the whole entire trial, that Jury Number 3 began crying during Dr. Nguyen's testimony regarding photographs, mostly about the time in which Mr. McClaren would be alive. So based upon that, I do have concerns—I would have concerns for that emotional response, just as to the doctor's very clinical testimony, and what type of, I guess, feelings were being brought up that caused [the juror] to have an emotional response to what he was saying." The court agreed to question whether the juror "can still be fair and impartial" but would not ask "what the emotions were." Neither side objected to that approach.

"[THE COURT]: Juror Number 3, the reason why we have you in here is because it's been called to my attention that during the testimony of Dr. Nguyen, the coroner—Do you remember that?

"JUROR NUMBER 3: Yes.

"THE COURT: I was informed that you were showing some emotion or that you cried. Does that sound familiar?

"JUROR NUMBER 3: Yes.

"THE COURT: Did you do that?

"JUROR NUMBER 3: Yes.

"THE COURT: Okay. My question to you is this. Did you cry because the testimony was of such an amount of something that caused you to get emotional? Do you understand the question?

"JUROR NUMBER 3: Um—

"THE COURT: Or better yet, why did you cry?

"JUROR NUMBER 3: I find it difficult to—

"THE COURT: To see things like that? Is that yes?

"JUROR NUMBER 3: Yes.

"THE COURT: And you're getting emotional now and you're crying now.

"JUROR NUMBER 3: Yes.

"THE COURT: It's okay. Take a deep breath. Let me ask you this, Juror Number 3. And you're human. That's normal. We're just trying to understand what happened. So my question to you is this. Because it's a normal human reaction, my next question is, even though that made you emotional, and even though you cried and you felt that way, are you still able to hear this case and be fair and impartial to both sides of the case?

"JUROR NUMBER 3: I believe so, yes.

"THE COURT: Okay. Can you wait until you hear all the evidence before you even start thinking about what you should be thinking about in this case?

"JUROR NUMBER 3: Yes. But I still feel like when I see images—

"THE COURT: Of course. Understood. As anybody would in certain instances. But the question is, understanding that you felt that, understanding that it made you emotional, have you made a decision on this case yet?

"JUROR NUMBER 3: No.

"THE COURT: Okay. And you can wait until the conclusion of this case when you go to deliberations to do that?

"JUROR NUMBER 3: Yes.

"THE COURT: And you'll be fair and impartial to both the defense and the People in this case?

"JUROR NUMBER 3: Yes."

Defense counsel did not object to the court's approach but asserted the juror had an "unjustifiable response to the photographs that were depicted." Defense counsel described the

11

autopsy photographs as "clinical," and again expressed concerned that because of the emotional response and sympathy the juror could not be impartial.  The court disagreed.  It found the juror's response "appropriate" and "human" and that the juror could be fair and impartial.  The juror was left on the panel.

The last paragraph of Penal Code section 1089 provides that a juror may be discharged during trial upon good cause shown if the court finds the juror is "unable to perform his or her duty."  Whether to discharge a juror is committed to the sound discretion of the trial court.  (*People v. Powell* (2018) 6 Cal.5th 136, 155.)  And deference is given to the trial court's observations of the juror's demeanor.  (*People v. Lucas* (1995) 12 Cal.4th 415, 489; see also *People v. Tate* (2010) 49 Cal.4th 635, 666.)  Here, the trial court interviewed the juror and concluded that the juror could remain fair and impartial despite the emotional response to certain photographs.  That conclusion is well supported by the record.

Smith argues in his brief, however, that this juror's "emotional outburst" called into question the juror's ability to perform and impacted the ability of the remainder of the jury panel to serve impartially.  This argument badly mischaracterizes the record.  Neither defense counsel nor the court saw the juror crying in court the day before; it may therefore be inferred that any crying was quiet and controlled and not a distraction to other jurors.  Further, although the juror cried during the court interview, no objection was made to the mode of the interview or its thoroughness, nor was any claim made that the juror was not being allowed to respond fully to the questions or that the court needed to interview the other panel members.  We defer to the trial court's decision as to how to

conduct the interview and its ultimate conclusion that the juror simply reacted in a human way and could remain fair and impartial.

IV    **Fines, Fees, and Assessments**

At the sentencing hearing, the court ordered Smith to pay restitution in the amount of $6,236.75. He was also ordered to pay a restitution fine of $300, a parole revocation fee of $300, a court security fee of $40, and a criminal conviction assessment of $30. These fines, fees, and assessments were all recommended in the probation officer's report and thus Smith had notice of their potential imposition and he could have objected and asked for an ability-to-pay hearing.

This claim has been forfeited because Smith did not object below to the fines, fees, and assessments (he agreed to the amount of the restitution order) and the statute impliedly presumes the defendant has the ability to pay. (*People v. Aguilar* (2015) 60 Cal.4th 862, 864; *People v. Avila* (2009) 46 Cal.4th 680, 728–729; *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.)[6] Even so, Smith argues the trial court did not make any express finding as to his ability to pay and thus under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) the fines, fees, and assessments must be vacated. He also argues they fall under Eighth Amendment analysis.

[6]    The Attorney General suggests this appeal is also barred by Penal Code section 1237.2 because Smith did not first file a motion in the trial court to correct the imposition of these fines, fees, and assessments. But by its express terms, section 1237.2 only applies when the only issue on appeal concerns the imposition or calculation of them. That is not this case.

The law in this area is unquestionably murky.  Our high court has granted review in several cases that test the boundaries of the ability-to-pay argument.  But given the clear forfeiture of this argument (the sentencing hearing here was conducted post-*Dueñas*) it seems that no matter the decision in those cases they will not revive the issue here.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SALTER, J.*

We concur:

BIGELOW, P. J.

GRIMES., J.

---

\*     Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.